UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON


CIVIL ACTION NO. 5:09-CV-00417-KKC

LLOYD DUNCAN                                                                                        PLAINTIFF

v.                          **MEMORANDUM OPINION AND ORDER**

JOHNSON-MATHERS HEALTH
CARE, INC. et al.                                                                                 DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the Motion to Dismiss (Rec. 18) filed by Defendant Johnson-Mathers Health Care, Inc. ("Johnson-Mathers").[1] Johnson-Mathers has moved to dismiss Counts I-IV, XIV, and XVI of the Complaint for its failure to state claims upon which relief can be granted. Specifically, Defendant asserts that Plaintiff seeks relief under statutes and regulations that do not provide a private right of action. Consistent therewith, Johnson-Mathers seeks dismissal of the remaining state law claims. This matter having been full briefed and for reasons stated below, the Court will grant Johnson-Mathers motion to dismiss Counts I-IV, XIV, and XVI of the Amended Complaint. Likewise, the Court will dismiss the remaining state law claims without prejudice.

**I.      FACTUAL BACKGROUND**

The Plaintiff in this case is Lloyd Duncan ("Duncan's Administrator"), Administrator of the estate of his brother, James R. ("Ronnie") Duncan, who at the time of his death was a patient

---

[1] Johnson-Mathers previously filed a motion to dismiss making similar arguments as the ones raised in the instant motion to dismiss. *See* Rec. 6. The instant (second) motion to dismiss was filed by Johnson-Mathers after Duncan was granted leave of the Court to file an Amended Complaint. By separate order, the Court has denied the first motion to dismiss as moot.

at Johnson-Mathers' facility in Carlisle, Kentucky. Ronnie was admitted to Johnson-Mathers on September 18, 2008 with multiple conditions including mental retardation and diabetes. While in residence at Johnson-Mathers, Ronnie Duncan was prescribed Coumadin, a commonly used anticoagulant.[2] Rec. 15, Amended Complaint at ¶ 8.

Duncan's Administrator claims that Johnson-Mathers failed to monitor the Coumadin's effects on Ronnie Duncan over a seven month period from September 2008 to April 2009.[3] *Id.* at ¶ 11. Therefore, Johnson-Mathers did not detect the elevated levels of PT/INR in Ronnie's blood that placed him at risk for severe bleeding if he sustained a cut, fall or other related injury.[4] *Id.* at ¶ 14. Johnson-Mathers was apparently aware that Ronnie Duncan had unsteady balance, required partial physical support, and was at a significant risk for falling. *Id.* at ¶ 16-17. In addition, medical records reveal that Ronnie Duncan suffered at least eight falls while residing at Johnson-Mathers. *Id.* at ¶ 18. Duncan's Administrator asserts that despite repeated falls, Johnson-Mathers failed to accurately update Ronnie's Plan of Care to reflect the increased risk of falling and failed to take appropriate preventative measures. *Id.* at ¶ 19. Moreover, Johnson-Mathers did not disclose the falls to Ronnie Duncan's physician. *Id.* at ¶ 20.

---

[2] Ronnie Duncan was also diabetic and had a special dietetic order prescribed by his physician which required Johnson-Mathers to provide a diet of 1800 calories per day. *Id.* at ¶ 9. Duncan's Administrator alleges that Johnson-Mathers failed to comply with this order as Ronnie Duncan gained over fifty pounds over a five month period. *Id.* at ¶ 10.

[3] Apparently, patients on Coumadin must have their prothrombin time (bleeding time) and international normalized ration ("PT/INR") monitored routinely every two to four weeks if within the targeted range and more frequently if necessary. *Id.* at ¶ 11. Duncan's Administrator states that because his blood was improperly monitored, Ronnie's PT/INR levels became critically high as documented on May 7, 2009 and May 13, 2009. *Id.* at ¶ 12. Duncan's Administrator also claims that patient's physician was not notified of the critical PT/INR levels until May 7, 2009. *Id.* at ¶ 13.

[4] Duncan's Administrator has indicated that Johnson-Mathers' policy for anticoagulation therapy does not contain guidelines for the frequency of routine monitoring of PT/INR levels for residents on Coumadin. *Id.* at ¶ 15.

Between the evening of May 12, 2009 and the early morning hours of May 13, 2009, Ronnie Duncan suffered a fall resulting in blunt force trauma to the head. *Id.* at ¶ 21. As a result, Ronnie Duncan began bleeding in his brain in multiple places. *Id.* at ¶ 22. Johnson-Mathers' employees found Ronnie on the floor at 2:45 a.m. and returned him to bed without medical examination, treatment or monitoring. *Id.* at ¶ 23-24. At around 3:45 a.m., Ronnie began crying out in pain and calling for his brother. *Id.* at ¶ 25. He was given a dose of Motrin. *Id.* Ronnie's physician was not notified of the head trauma until approximately 6:00 a.m. *Id.* at ¶ 27.

By 7:45 a.m., Ronnie had become lethargic, disorientated and began vomiting. *Id.* at ¶ 32. Ronnie's physician was notified a second time and ordered a Computer Tomography scan ("CT scan") of Ronnie's head. *Id.* at ¶ 33-34. The CT scan identified multiple subdural hematomas (bleeding on the brain). *Id.* at ¶ 35. Ronnie was then transferred to the University of Kentucky Hospital around 12:05 p.m. *Id.* at ¶ 36. By the time he arrived at the hospital, Ronnie was non-responsive to stimuli and required rapid sequence intubation. *Id.* at ¶ 37. He never regained consciousness and died on May 15, 2009. *Id.* at ¶ 37-38.

The Complaint contains several causes of action against Johnson-Mathers related to the treatment Ronnie received while he was at its facility. The first four counts allege violations of the Federal Nursing Home Reform Act of 2000 ("FNHRA"), 42 U.S.C. §§ 1395i-3(g), 1396, and various regulations promulgated to implement the statutory mandates. Count I alleges that Johnson-Mathers violated 42 C.F.R. § 483.25 by failing to have an effective system in place to ensure that residents received necessary care and services after experiencing a fall. *Id.* at ¶ 43. Count II alleges a violation of 42 C.F.R. § 483.60(c) which requires nursing home facilities to

submit patients' drug regimens for review by a licensed pharmacist at least once per month and to report irregularities. *Id.* at ¶ 48. Count III alleges that Johnson-Mathers violated 42 C.F.R. § 483.75 by failing to ensure resources were utilized effectively and efficiently to guarantee the delivery of required care and services. *Id.* at ¶ 52. Count IV alleges that Johnson-Mathers violated 42 C.F.R. § 483.75(o)(1) by failing to have an effective Quality Assurance Committee structured to identify quality issues that might have a negative impact on residents of the facility. *Id.* at ¶ 58. Count XIV alleges that Johnson-Mathers violated the Developmental Disabilities and Bill of Rights Act of 2000 ("the DDABRA"), 42 U.S.C. § 15001 et seq. by failing to provide the "appropriate treatment, services, and habilitation for such disabilities consistent with section 15001(c) of this title," and failing to provide "the treatment, services, and habitation for an individual with developmental disabilities...designed to maximize the potential of the individual." *See* 42 U.S.C. § 15009. Count XVI, also asserts that the same violations subject Johnson-Mathers to liability under 42 U.S.C. § 1983. The Complaint also contains various state law claims against Johnson-Mathers and other Defendants in this action.

## II.     MOTION TO DISMISS

Johnson-Mathers filed the instant motion on grounds that neither DDABRA nor the FNHRA and its implementing regulations confers a private right of action upon Duncan's Administrator. Johnson-Mathers also asserts that Duncan's Administrator does not have a right of action for these alleged violations under 42 U.S.C. § 1983.

### A. Standard of Review

In reviewing a Rule 12(b)(6) motion to dismiss, this Court "must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true. When

an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). However, in order to survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" so that his claim crosses "the line from conceivable to plausible." *Id.* at 570. In practice, a complaint must contain "either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)(quotations omitted).

### B. Claims under the FNHRA and Implementing Regulations

Counts I-IV assert private rights of action directly under 42 C.F.R. § 483.25, 42 C.F.R. § 483.60(C), 42 C.F.R. § 483.75, 42 C.F.R. § 483.75(o), as well as under the FNHRA. There is also a claim asserted for these same violations under 42 U.S.C. § 1983. The question raised by Johnson-Mathers' motion to dismiss is whether the statutes and regulations cited in the Complaint create enforceable rights for private parties.

**1. The Purpose and Design of the Medicare and Medicaid Acts**

The Medicare Act, established pursuant to Title XVIII of the Social Security Act ("SSA"), is a federal program designed to provide health insurance for elderly and disabled persons. 42 U.S.C. § 1395 et seq., s*ee* §§ 1395c, 1395d. Medicare providers participate in the program by entering into agreements with the Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"), which administers the program. *See Battle Creek Health Sys. v.*

5

*Leavitt*, 498 F.3d 401, 403 (6th Cir. 2007).

The Medicaid Act, established pursuant to Title XIX of the SSA, is a joint program funded by the state and federal governments to provide medical assistance to certain needy persons. 42 U.S.C. § 1396; *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S. Ct. 2510 110 L. Ed. 2d 455 (1990). The Medicaid Act is administered by the individual states that participate in the program. State participation is optional, but once a state chooses to participate, it must adopt a plan that conforms to the requirements set forth in the Medicaid Act.[5] *Schott v. Olszewski*, 401 F.3d 682, 685 (6th Cir. 2005); *see also Wilder*, 496 U.S. at 502.

Both the Medicare and Medicaid Acts authorize the payment of federal funds to reimburse nursing homes for services provided to residents. However, in order to qualify for these reimbursements, nursing facilities must be certified. Certification under the Medicare program requires nursing facilities to comply with certain requirements set forth in 42 U.S.C. § 1395i-(3)(b)-(d), and its implementing regulations. Nursing facilities seeking certification under the Medicaid program must comply with the requirements set forth in 42 U.S.C. § 1396r(b)-(d) and its implementing regulations, such as 42 C.F.R. § 442.1. In addition, state survey agencies generally conduct inspections of nursing homes to ensure their continued compliance with program requirements. *See* 42 U.S.C. §§ 1395i-(3)(g)(1)(A), 1396r(g)(1)(A).

**2. The Federal Nursing Home Reform Act (FNHRA)**

Prior to congressional amendments to the Medicare and Medicaid Acts in 1987, only limited sanctions were available against nursing homes failing to comply with federal participation requirements. First, the Secretary of Health and Human Services ("HHS") or the

---

[5] *See,* 42 U.S.C.§1396 for the requirements of the Medicaid Act.

States could decertify the facility and terminate the facility's eligibility for receiving Medicaid reimbursements. H.R. Rep. No. 100-391, at 471 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-290. Second, under circumstances where non-compliance did not pose an immediate and serious threat to the health and safety of nursing home residents, the Secretary or the State could deny payments for new admissions for up to eleven months. *Id.*

Because these sanctions were rarely invoked, the Medicare and Medicaid programs allowed nursing home facilities to provide substandard services while remaining in operation and receiving federal funding. *Id.* at 471, *reprinted in* 1987 U.S.C.C.A.N. at 2313-291. As knowledge of these problems became more widespread, Congress became "deeply troubled that the Federal government, through the Medicaid program, continued to pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries." *Id.* at 452, *reprinted in* U.S.C.C.A.N. at 2313-272.

Congress attempted to address these problems by passing the FNHRA, which was contained in the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, §§ 4201-4218, 1987 U.S.C.C.A.N. (101 Stat.) 1330, 1330-160 to 1330-221 (codified at 42 U.S.C. §§ 1395i-(3), 1396r). The FNHRA provides for enhanced oversight and inspection of nursing homes participating in the Medicare and Medicaid programs. Among the requirements is that participating nursing homes are subject to an unannounced "standard survey" at least once every fifteen months. 42 U.S.C. § 1395i-3(g)(2)(A). If this survey reveals that a nursing home facility is failing to meet the required standard of care, the facility must undergo an "extended survey." 42 U.S.C. § 1395i-3(g)(2)(B). The certification requirements also subject nursing homes to federal standards in certain areas including "quality of care" and "resident rights." 42 U.S.C. §§

1395i-3(g), 1396r(g).

The 1987 Amendments also included several additional intermediate sanctions designed to encourage nursing homes to comply with the federal participation requirements. Congress allowed for the denial of payments for all Medicare beneficiaries and all newly admitted Medicaid beneficiaries, civil monetary penalties under both Acts for each day of non-compliance, appointment of temporary management, and under the Medicaid Act, closure of the non-conforming nursing home and transfer of its residents to other conforming facilities. 42 U.S.C. §§ 1395i-3(h)(2)(B), 1396r(h)(2)(A), 1396r(h)(3). These more stringent enforcement mechanisms are implemented by the Secretary of HHS and state governments.

**3. Whether there is an Implied Right of Action**

In cases that turn on whether a plaintiff has a statutory right of action, this Court must first examine the language of the statute itself. *Cannon v. Univ. of Chicago*, 4441 U.S. 677, 689, 99 S. Ct. 1946 (1979). The Supreme Court has long recognized that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Id.* at 688. In this case, Duncan's Administrator concedes, as he must, that the FNHRA and regulations forming the basis of his claims in Counts I-IV do not expressly provide for a private right of action. As a result, Duncan's Administrator may pursue a private right of action only if it can be implied directly under the DDABRA or the FNHRA and its implementing regulations, or if he has a right of action under section 1983.[6]

In *Gonzaga University v. Doe*, the Supreme Court held that the Family Education Rights

---

[6] 42 U.S.C. § 1983 imposes liability on persons who, "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

and Privacy Act of 1974 ("FERPA") did not create personal rights enforceable under section 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 276, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). In reviewing its prior decisions on rights of actions under section 1983 and also under federal statutes,[7] the Court emphasized that "in either case we must first determine whether Congress *intended to create a federal right*." *Id.* at 283 (emphasis added). The Court stressed that nothing "short of an unambiguously conferred right" supports a cause of action under section 1983 or directly under a statute. *Id.* Accordingly, the Court explained that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under section 1983 or under an implied right of action." *Id.* at 286.

In order to determine whether Duncan's Administrator may pursue a private right of action under the FNHRA, the Court will first look to Supreme Court precedent analyzing whether private rights of action are available for violations of other legislation passed pursuant to Congress' Spending Clause power. If such actions are not available, the Court will consider whether Congress intended to create a right that is enforceable under section 1983. The Supreme Court first recognized that section 1983 actions can be brought against state actors to enforce rights created by federal statutes as well as by the Constitution in *Maine v. Thiboutot*, 448 U.S. 1, 65 L. Ed. 2d 555, 100 S. Ct. 2502 (1980). In *Maine*, the Court held that the plaintiffs could

---

[7] A significant distinction between the implied private rights of action directly under a statute or actions under section 1983 is that plaintiffs suing under section 1983 do not have the burden of showing a congressional intent to create a private remedy because section 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. *Id.* at 284. As a result, once a plaintiff establishes that a statute confers an individual right, such a right is presumptively enforceable under section 1983. *Id.* Conversely, a plaintiff attempting to pursue a right of action directly under a statute has the burden of establishing congressional intent to provide a federal remedy for the violation of the federal right. *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 286, 149 L. Ed. 2d 517, 121 S. Ct. 1511 (2001).

recover payments that were wrongfully withheld by a state agency in violation of the Social Security Act. *Id.* at 4. However, one year later in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981), the Court rejected a claim that the Developmental Disabled Assistance and Bill of Rights Act of 1975 conferred enforceable rights. *Id.* at 28. The Court explained that:

> [i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.

*Id.* at 28. The Court further indicated that where Congress intends to impose conditions on the grant of federal funding and provide a mechanism for private enforcement of spending clause legislation through section 1983, it must "speak with a clear voice" and manifest its intent "unambiguously." *Id.* at 17.

This hesitancy to find private causes of action to enforce Spending Clause legislation has been reflected by the Supreme Court's recent case law which has only rarely found Spending Clause legislation to create privately enforceable rights. In *Wright v. Roanoke Redevelopment and Housing Authority*, tenants residing in low income housing projects brought suit under section 1983, alleging that they had been over-billed for their utilities in violation of the rent ceiling imposed by the Brooke Amendment to the Housing Act of 1937 and the implementing regulations of the Department of Housing and Urban Development ("HUD"). *Wright v. Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 419, 107 S. Ct. 766, 93 L. Ed. 2d 781 (1987). The Court found that the provisions in question unambiguously conferred "a mandatory limitation focusing on the individual family and its income" and that "[the intent to benefit tenants. . .[was]

10

undeniable."[8] *Id.* at 430. A significant aspect of the Court's holding was that "the benefits Congress intended to confer on tenants. . .[were] sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983," rights that were not "beyond the competence of the judiciary to enforce."[9] *Id.* at 432. The Court also recognized that HUD, which was charged with administering the Act "had never provided a procedure by which tenants could complain to it about the alleged failures [of state welfare agencies] to abide" by the Act's rent ceiling provisions. *Id.* at 426.

In *Wilder v. Virginia Hospital Association*, the issue before the Supreme Court was whether health care providers could bring an action under section 1983 to challenge the methods used by a state to reimburse them under the Medicaid Act. *Wilder*, 496 U.S. at 501 (1990).[10] The Court allowed the action to enforce the reimbursement provision of the Medicaid Act, because the provision, like the rent ceiling provision in *Wright*, imposed a binding obligation on States participating in the Medicaid program "to adopt reasonable and adequate rates" and was "cast in mandatory terms." *Id.* at 512. The Court emphasized that states were required to pay an "objective" monetary entitlement to health care providers and that the available administrative procedures were insufficient to foreclose the action. *Id.* at 522-23.

---

[8] The Court also gave some deference to the HUD's opinion that tenant remedies would be available under the Act in federal court. *Id.* at 427. This finding was based on comments accompanying the final implementing regulations indicating that a proposal to limit challenges to state-court actions had been abandoned. *Id.*

[9] The provision in question allowed for a "reasonable" allowance for utilities. *Id.* at 431. The Court rejected a challenge that this provision was too vague and amorphous to confer enforceable individual rights on the tenants because the implementing regulations "specifically set out guidelines that the PHAs were to follow in establishing utility allowances. . . ." *Id.* at 431-32.

[10] The more specific question before the Court was whether the Boren Amendment of the Medicaid Act requiring reimbursement according to rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," could be enforced pursuant to section 1983. *Id.* at 501; *see* 42 U.S.C. § 1396a(a)(13)(A).

The Supreme Court's more recent decisions have rebuffed attempts to infer new enforceable rights from Spending Clause statutes. In *Suter v. Artist M.*, the Court addressed whether private individuals had the right to file suit to enforce a provision of the Adoption Assistance and Child Welfare Act of 1980 directly under the Act or under section 1983. *Suter v. Artist M.*, 503 U.S. 347, 350, 112 S. Ct. 1360, 118 L. Ed. 2d 1 (1992). The provision in question required States to make "reasonable efforts" to prevent children from being removed to foster homes and to make efforts to reunify the children with their families after removal. *Id.* at 357. A class of parents was seeking to enforce this requirement against state officials, claiming that no such efforts had been made. The Court distinguished *Wilder* because there was no statutory guidance of how "reasonable efforts" were to be measured. *Id.* at 360. Ultimately the Court explained that:

> the "reasonable efforts" language does not unambiguously confer an enforceable right on the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner [of reducing or eliminating payments].

*Id.* at 363. Because the Supreme Court found that the "reasonable efforts" provision did not confer specific, individually enforceable rights, the Court found that the statute did not create an implied cause of action on their behalf. *Id.* at 364.

Similarly, in *Blessing v. Freestone*, the Supreme Court determined that Title IV-D of the Social Security Act did not create enforceable individual rights for plaintiffs to have the State's program achieve "substantial compliance" with the requirements of Title IV-D aimed at ensuring timely payments of child support. *Blessing v. Freestone*, 520 U.S. 329, 332-33, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997). The Court found that:

12

> [f]ar from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied.

*Id.* at 343 (emphasis in original). According to the Court, the "substantial compliance" standard was designed primarily to guide the State in structuring its systemwide efforts at enforcing support obligations. *Id.* Because the "substantial compliance" requirement did not create individual rights, it could not be enforced by an action under section 1983. Furthermore, the Court emphasized that when bringing an action under section 1983, plaintiffs have the obligation to assert a violation of a federal right, not simply a violation of a federal law. *Id.* at 340.

Duncan's Administrator makes several arguments in favor of a finding by this Court that he has an implied private right of action under the FNHRA. First, Duncan's Administrator argues that his brother was an intended beneficiary of 42 U.S.C. § 1396r because he was a nursing home resident and Medicaid recipient. Second, Duncan's Administrator argues that the rights he asserts were violated are not so "vague or amorphous" that their enforcement would strain judicial resources.[11] Finally, Duncan's Administrator argues that the statutory language of the FNHRA mandates compliance with the Act and therefore, creates an identifiable individual right.

In reviewing 42 U.S.C. § 1396r and the implementing regulations referred to by Duncan's Administrator in the amended complaint, the Court does not find that Congress unambiguously intended to create new individual rights or enforceable individual rights of action

---

[11] In making this argument, Duncan's Administrator relies on the repeated use of such phrases in the statute as "must provide," "must maintain," and "must conduct." Duncan's Administrator claims that these provisions indicate that nursing homes are required to provide a specific level of service and care for Medicaid patients and must respect their enumerated rights.

in the FNHRA. This statute is entitled "Requirements for nursing facilities." The statute sets forth various requirements for nursing homes related to providing services and activities, including some related to maintaining quality of life. The statute does not have an "unmistakable" focus on the rights of individual nursing home residents, but instead focuses on requirements that the nursing homes must meet in order to become and remain eligible for funding. *Alexander v. Sandoval*, 532 U.S. 275, 289, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001).

Duncan's Administrator cites *Grammar v. John J. Kane Regional Centers - Glen Hazel*, in which the Court held that the FNHRA conferred specific rights because "Congress explicitly included the words 'rights' when identifying the expectations and entitlements of nursing homes residents." 570 F.3d 520, 531 (3d Cir. 2009). This Court declines to adopt the holding of the Third Circuit in *Grammar* because it appears to be inconsistent with the Supreme Court's admonition in *Gonzaga* that statutes only display a Congressional intent to create federal rights when their text has "an unmistakable focus on the benefitted class." *Gonzaga v. Doe*, 536 U.S. at 283. While the FNHRA clearly speaks of the rights of nursing home residents, the focus of the statute is on setting forth requirements that nursing homes must follow to maintain their certifications and eligibility for federal funding. While these requirements were surely passed with the intent to improve the quality of care received by nursing home residents, the statute's focus is on the nursing homes - not the nursing home residents.

The reasoning in *Grammar* is also inconsistent with the Supreme Court's decision in *Pennhurst,* which indicated that there is no presumption of enforceabilty simply because a statute speaks in terms of rights. *Pennhurst,* 451 U.S. at 18-20. Upon further review of *Grammar*, the Court finds the reasoning of Judge Stafford's dissenting opinion more persuasive and more

14

consistent with recent Supreme Court precedent. In his dissent, Judge Stafford explained that:

> Under the Medicaid Act, the federal government directs funding to states to assist them in providing medical assistance to certain eligible individuals. To receive federal funds under the Medicaid Act, states are required to administer low-income medical assistance programs pursuant to State plans approved by the Secretary of Health and Human Services. The Act sets forth detailed requirements for state plans. Among many other things, the Act provides that [a] State plan for medical assistance must...provide...that any nursing facility receiving payments under such plan must satisfy all of the requirements of subsections (b) through (d) of section 1396r. Section 1396r lists the requirements that nursing facilities –as recipients of federal funding–must meet relating to the provision of services to its Medicaid patients. Importantly, in each of the provisions in subsections (b) through (d), namely subsections (b)(1)-(8), (c)(1)-(8) and (d)(1)-(4), Congress began by stating: "The nursing facility must. . ." In each case, the focus is on what the nursing home facility must do in return for federal funds; the focus is not *on* the individuals to whom the benefits of each provision flows.
>
> In *Gonzaga*, the Supreme Court noted that its more recent decisions...have rejected attempts to infer enforceable rights from Spending Clause statutes....I do not agree that Congress intended to confer upon nursing home residents the right to invoke section 1983 to sue individual nursing homes for alleged violations of the non-monetary service requirements set forth in section 1396r.

*Grammar*, 570 F.3d 533-534 (Stafford, J., dissenting). The Court fully agrees with this reasoning.

The implementing regulations that Duncan's Administrator relies on provide further support for the Court's conclusion that the FNHRA does not have an "unmistakable" focus on nursing home residents. For example, 42 C.F.R. § 483.25 concerns the "quality of care" that nursing homes are required to provide. Rather than focusing on individual nursing home residents, the regulation sets for standards and requirements for patient care and maintenance. For example, nursing homes should ensure that residents' abilities in the activities of daily living do not diminish. 42 C.F.R. § 483.25(a). Nursing homes are also required to ensure that their residents receive proper treatment and assistance to maintain their vision and hearing abilities. 42 C.F.R. at § 483.25(b). Similarly nursing homes are subject to certain expectations with

regard to pressure sores, urinary incontinence, range of motion, mental and psycho-social functioning, nano-gastric tubes, accidents, nutrition, hydration, special needs and medication errors. 42 C.F.R. § 483.25(c)-(m). Each of these subsections begins with the "facility must ensure that...." Clearly these regulations articulate the duties and obligations of the regulated entities - nursing homes - for the benefit and protection of nursing home residents. Thus, regulators must enforce the regulations, not nursing home patients. *Alexander*, 532 U.S. at 289.

Duncan's Administrator relies on other regulations that similarly have an "unmistakable" focus on nursing homes - rather than on their residents. For example, 42 C.F.R. § 483.60(a) requires that nursing homes "must provide pharmaceutical services .. .to meet the needs of each resident." However, this regulation merely provides that in order to do business, a nursing home must provide adequate services to meet the needs of all residents. Once again, the focus is on what services the nursing homes must provide to receive funding and not on the specific rights of their residents.

Similarly, 42 C.F.R. § 483.75 focuses on the administration of nursing homes and requires that they be licensed, comply with all applicable laws, meet HHS regulations, and have a governing body "responsible for establishing and implementing policies regarding the management and operation of the facility." The regulation also sets forth training requirements for nurses aids and other professional staff. Again, this regulation is focused on nursing homes and their eligibility for federal funding.[12]

In finding that the FNHRA does not create enforceable rights, the Court is mindful of the

---

[12] Duncan's Administrator also asserts a violation of 42 C.F.R. 483.75(o)(1) which requires nursing homes to have quality assessment and assurance committees. However, once again this part of the regulation focuses on the requirements that nursing homes must meet to receive federal funding and does not focus on the rights of individual nursing home residents.

16

Supreme Court's hesitancy to associate Spending Clause legislation with individual rights. Additionally, the Court finds that the statutes and regulations at issue are distinguishable from the individualized, concrete monetary entitlements that the Supreme Court has found to create individually enforceable rights under section 1983. *See Gonzaga*, 536 U.S. at 289. Because Congress has not spoken with a clear voice and manifested an unambiguous intent to confer individual rights on nursing home residents, this Court finds that there is no basis for private enforcement directly under the statute or under section 1983. Accordingly, the Court will grant Johnson-Mathers' motion to dismiss with respect to Counts I-IV and XVI.

**C. The Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DDABRA)**

In Count XIV, Duncan's Administrator asserts that Johnson-Mathers violated the DDABRA by failing to provide the "appropriate treatment, services, and habitation" and failing to provide "treatment, services, and habitation...designed to maximize the potential" of individuals with developmental disabilities. 42 U.S.C. § 15009.

Duncan's Administrator acknowledges that the statute in question does not expressly provide a private right of action. However, he contends that a private right of action can be implied directly under the statute. In order for a private right of action to be implied directly under the DDABRA, Plaintiff has the burden of showing that the statute "displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. at 286.

In *Pennhurst* , the Supreme Court considered whether Congress intended the DDABRA of 1975, (the statutory predecessor of 42 U.S.C. § 15009) to create enforceable rights and obligations in favor of the mentally retarded to "appropriate treatment" in the "least restrictive"

17

environment. 451 U.S. at 11. The *Pennhurst* plaintiff brought suit against the hospital alleging that conditions were unsanitary, inhumane, dangerous and violated her rights under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001 et seq. (1976 ed. and Supp. III). *Id.* at 6. In reviewing the statute, the Supreme Court determined that is was a funding statute designed to assist the states in improving the care and treatment of the mentally retarded through the use of federal grants. *Id.* at 18. In looking at the statutory text, structure, and legislative history, the Court concluded that because the statute merely expressed a congressional preference for a certain kind of treatment, substantive rights could not be read into it. *Id.* at 19. Due to the fact that the Supreme Court held that the Bill of Rights provision did not create substantive rights for developmentally disabled individuals, the Court did not need to reach the question whether there was a private right of action under the statute or a right enforceable under section 1983. *Id.* at 28 n. 21.

In light of the significant similarities between section 15009 of the DDABRA and the language of the DDABRA of 1975 which was interpreted by the Supreme Court in *Pennhurst*, the Court finds that the Bill of Rights provision of the DDABRA does not confer privately enforceable substantive rights. In opposition to this conclusion, Duncan's Administrator argues that *Pennhurst* is not relevant to the Court's present inquiry because the Supreme Court did not address whether a private right of action exists under the DDABRA. However, this argument misses the fact that *Pennhurst* did not need to reach that question based on the Supreme Court's holding that the statute did not create any substantive rights. *Id.* at 28 n. 21.

Because the Court has determined that the "Bill of Rights" provision of the DDABRA does not create substantive rights, Duncan's Administrator cannot pursue a private right of action

18

either directly under the Bill of Rights provision of the DDABRA or through section 1983. Accordingly, the Court will grant Johnson-Mathers' motion to dismiss Counts XIV and XVI.

**D. State Law Claims**

Having concluded that Johnson-Mathers motion to dismiss should be granted as to all of the federal law claims raised in Counts I-IV, XIV and XVI, the Court's original jurisdiction has been extinguished. Johnson-Mathers has requested that the remaining state law claims should be dismissed on this basis. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction. *See also Gregory v. Hunt*, 24 F.3d 781 (6th Cir. 1994). In this case, the Court will decline to exercise supplemental jurisdiction over Duncan's Administrator's remaining state law claims and will dismiss them without prejudice in accordance with 28 U.S.C. § 1367(c)(3).

**III. CONCLUSION**

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

(1) Johnson-Mathers' first motion to dismiss (Rec. 6) is **DENIED as MOOT.**

(2) Johnson-Mathers' second motion to dismiss (Rec. 18) is **GRANTED** and Counts I-IV, XIV and XVI are **DISMISSED WITH PREJUDICE.**

(3) Duncan's Administrator's state court claims asserted in Counts V-XIII, XV and XVII are **DISMISSED WITHOUT PREJUDICE** for Duncan's Administrator to assert in state court.

(4) A Judgment consistent with this Opinion & Order will be entered contemporaneously.

This 28th day of July, 2010.



Signed By:
*Karen K. Caldwell*
United States District Judge